### SCHWEYER ELECTRIC & MANUFACTURING CO. v. READING CO. et al.

No. 4207.

District Court, E. D. Pennsylvania.
March 26, 1931.

Alfred N. Keim, of Philadelphia, Pa., Church & Church, Melville Church, and C.

B. Des Jardins, all of Washington, D. C., and Morrison, Kennedy & Campbell and Donald Campbell, all of New York City, for plaintiff.

Busser & Harding, of Philadelphia, Pa., A. L. Vencill, of Swissvale, Pa., and Bartlett, Eyre, Scott & Keel, and Richard Eyre, all of New York City, for defendants.

DICKINSON, District Judge.

This cause concerns letters patent No. 1,279,454, issued September 17, 1918, on an application filed February 9, 1915, for a train-stopping apparatus, and letters patent No. 1,389,602, issued September 6, 1921, on an application filed September 6, 1916, for an automatic train control system, both granted to Daniel Herbert Schweyer.

The patents are paper patents, in the sense that the patentee's system has never been in use otherwise than in a testing trial, and is not now in use unless the systems which are in use are infringements. The inventor is thus denied the benefit of what is often persuasive evidence of invention. When one enters upon a field of invention, such as the one to which these patents relate, which is so far occupied as to be crowded, and he yet makes a contribution to the art which is a real benefaction, and commands the tribute of a recognition of its merits from those who are selfishly interested to deny to it exclusive rights, the courts are bound to accept this as evidence of the right to the reward of a patent. This opportunity was denied to all inventors in this field. There can be such evidence only when there is an open market for the invented thing. Here there was no such market. The only users and hence purchasers of devices of the kind with which we are now concerned are the railroads. Two special influences are at work to give to the contributions of those outside of railroad circles a cold welcome in addition to the adverse influences which all inventors encounter. One is the to be expected unbelief on the part of those who have official responsibility for the installation of systems of train operations in the merits of any new system proposed by outsiders. Another is the likewise to be expected preference of railroad managements to deal with those who are in this railroad fraternity and a reluctance to go outside of them in making railroad contracts. No system of control of train movements would be adopted merely because it looked all right on paper. It must first be checked up and its merits demonstrated by the test of actual trial. No such trial test could be made without the co-operation of some railroad. Few inventors could meet the expense of this. Few railroads would volunteer to bear this expense. It is in consequence through no fault of Schweyer that his system has not been installed on any railroad. This situation is reflected in the pleadings in this case and the developments of this trial. The answer in denying validity to plaintiff's patents charges also that the system and devices through which it is designed to work will not work, and that the system is an inoperative one. This charge was abandoned at the trial, but it is in the answer.

Through pressure brought to bear upon the railroads, to which reference is later made, Schweyer induced one of them to give his system the test of an actual trial. Representatives of the defendants witnessed this test. Later, as we will hereafter learn, the railroads installed systems of automatic train control, and the one here in controversy was put in operation on the Atlantic City division of the Reading Railroad. Schweyer, however, was not asked to put in his system, but one was installed under a contract with the Union Switch & Signal Company, which in a real sense is the defendant here. In the mind of Schweyer, whether openly avowed or not, there is of course the conviction that the system installed on the Atlantic City Railroad is the system, the merits of which defendants' experts learned from witnessing the trial test of his system.

We dispose, so far as concerns this court, of the criticisms of the Schweyer system by the finding that, although it has some features which, as will hereafter more clearly appear, are not acceptable to railroad managements, and is lacking in others which they favor, it none the less is a workable system, and with some modifications in these and other features which do not destroy nor materially affect its integrity as a system, is one which would prove efficient if installed. None the less the patents are paper patents and present the potential situation of a contribution to humanity, the benefits of which are so great as to be unspeakable, being compelled to be withheld, except at the cost of paying tribute to those who have intruded themselves upon the art only so far as to be in a position to demand tribute. This contrast of the rights of the respective parties to this cause calls for the exercise of the most discriminating judgment in deciding upon the conflict between them.

No one can grasp this controversy in all its fullness as one between two systems of train movement control without a masterful

knowledge of pneumatics, mechanics, and electrical engineering, as well as a working knowledge of the requirements of train movements. It is, however, we hope possible for the mind uninformed upon these subjects to so analyze the fact situation as to present the applicable principles of law. What may otherwise seem to be a diversion is necessary to bring out the legal features. The genesis of this art is most impressive. Peace in its industrial aspect has its holocausts of human sacrifices more appalling even than those of war. In the history of industrial development there is nothing so cheap as human life. The statistical story of the number of humans killed and maimed in transportation would be incredible were not the accuracy of the figures unquestionable. The grand total of all must be absolutely horrifying because the number due to a single cause is frightful. Assuming a system of train control movements to have been found and introduced so that all danger of collision accidents had been eliminated, except those which flowed from the failure of the operators to do their duty, the number of victims from this one cause was yet astonishingly large. Eliminating, we repeat, all others except those killed or injured because of the failure of locomotive engineers to heed signal warnings, from this one cause alone a human life was lost every hour of the twenty-four, and a human being was injured in every eight minutes of elapsed time. This means that in a single year upwards of 75,000 were killed and injured. If to this is added the hundreds of millions of dollars in destroyed and damaged property and other direct money loss, it is truly astonishing that the railroad managements from purely selfish motives did not welcome the introduction of safety devices which would end or lessen such loss. Money making organizations are not expected to be altruistic, but, however lacking in sympathy with human suffering, they are expected to have a sensitive pocket nerve. The lamentable truth is, however, that the disclosures of this trial reveal that the railroad managements not only gave the cold shoulder to the suggestion of automatic train control devices, but it required the lapse of nearly a generation in time and the compulsion of the law to induce the railroads (with the exception of a few more or less experimental trials) to install these devices on their trains. There was beyond all doubt a crying need for them; yet it took from shortly after 1900 when the subject began to be agitated until 1923 to have them installed. There must have been a deeper reason than the mere saving of the cost to explain the apathy, if not opposition, of the railroads.

The public interest had long been aroused. Boards and commissions which have been created in the hope to provide regulation of public utility corporations, and to hold them to the performance of the duty they owe to the public, too often do not function unless forced into action by pressure from some selfish interest. Spurred perhaps by Legislatures and by Congress, these boards and commissions actively took up with this general subject. They were early convinced that automatic train control systems were feasible and busied themselves not only through their own limited corps of experts, but by stimulating independent inventors to produce and perfect systems of automatic control, by extending to them every aid in their power. Experts were sent to observe and to assist in trial tests of all systems subjected to such tests and official trial tests were made. All suggestions offered were subjected to exhaustive discussion. Railroad managers were persuaded, whenever they could be, to permit of these tests and to provide for the expense of having them made. At least one railroad which had met with more than its pro rata share of accidents believed to be thus preventable made a contribution to the development of the art by offering a substantial sum of money as a reward to any one who would devise a system which would meet the requirements laid down. The response to this came from the whole world of inventors. There were of course also in the field those who had the urge to invent, for there is an itch to invent as well as the itch scribendi. With such a movement on foot, the railroad experts who had to do with train signals or other parts of railroad management concerned with the general subject could not keep out of it, and made their contributions to the art. The result was the whole inventive field was very fully combed over, and there was very little unoccupied territory. Another thing which restricted the field of invention was the conditions of the problem. It included a system of brake application. It included also a block and a signal system. It took in a "pick up" system or method of getting information of when signals should be displayed and what were to be displayed. Finally it required a method of co-ordinating all these things and translating them into an automatic train control action.

At the time Schweyer entered the field, there was in use a well-developed air brake system. Its use may be said to have been

universal. The railroads could not be expected to abandon the system in use or even to accept of any substantial modification of it. One condition of the problem in consequence was that the train control device must incorporate the air brake system as it was. Indeed there was no need to do anything else, for the air brake system had been as nearly perfected as human limitations permit. The block system was likewise in quite general use on the railroads. This also was required to be incorporated in the new system with its constructions as already in use. The block system could not be discarded. There were also signal systems in use. Here there was not the same unanimity as in the case of air brakes, the use of which was almost universal, or in the block system the use of which was very general. There was no such general system of signals, but there was a universal use of some signal system. There was also in use some method of "pick ups." One was operated through physical contact with a wayside construction; another through an induction coil. There was here again some method of getting the required information. In the early days there was a pronounced difference of opinion in respect to how the system should operate. The use of air brakes and signals had progressed to the stage that there was supplied or displayed to the engine man, as his train proceeded, information of what he was to do. This might be as formerly a telegraphed or telephoned message delivered to him. It might be a semaphore indication which told him what to do. The weak point in every system was that it was dependent for its efficiency upon whether the engine man heeded the information given him and did what he was told to do. This is the so-called "human element." If the information was given by a semaphore, he might miss it because his attention was distracted or his view obscured by fog or rain, or he might be incapacitated by sickness. He might likewise disobey or disregard a received order or warning to, as the expression goes, "take a chance." This risk of missing a signal was lessened by having one flashed before his face in the cab.

We have not preserved the chronology of the introduction of what was already in use before Schweyer, but those mentioned and others were available. The purpose to be served by the system in question was single. It was to eliminate the risk of a dereliction or failure of duty on the part of the engine man. It was likewise simple in its general thought of putting an automaton in the cab to assure observance of signals. It is said not to be a "complete automaton," because, as long as the engineer is what is known to this record as "alert," the train control system does not function. This latter was not at first the idea, nor was it such in the time of Schweyer, although his first patent incorporates it. That branch of the Interstate Commerce Commission which had taken over the subject of the introduction of train control systems favored a system which would function not only when the engineer was doing all he should do, but in spite of anything he could do. This displacement of the engineer was not favored by the railroad managements. Later the Commission changed its views or deferred to the railroad view, but in the time of Schweyer the idea was accepted and is incorporated in his second patent that the automatic system should at all times function and should be beyond the control of the engineer.

As we have said, there were different signal systems in use. One was that known to this record as the three position or three speed system. This meant in connection with the block system the display of one of three signals which, in the terminology of this case, is "clear," "caution," or "danger." The latter is called also "stop." Blocks are of different lengths. Taking a mile distance for illustration, there was provided a safety space of at least two full blocks or two miles between following trains. When there were two unoccupied blocks ahead of a train, the signal displayed at the entrance of the approached block was a "clear" signal. This meant the train might proceed at full speed or speed up to the prescribed limit until it came to the then next block. If this block was clear, but the block ahead of it was occupied, a "caution" signal was displayed. This meant that the train might proceed, but at a reduced speed throughout the block upon which it was entering. If the then next block was occupied before it was entered upon, a "danger" or "stop" signal was displayed. Each train as it passed along in its train movement actuated the signals displayed to the following train, so that the train ahead kept the following train informed of its position and the condition respecting occupancy of the tracks for two full blocks in advance. There are in use two methods or systems of giving this information. One, known as the "intermittent" method, "picked up" its information at a predetermined point and translated this into the appropriate signal to which there was adherence until the next point was reached. This meant that

the signal called for by track conditions ahead at the instant of passing one of these points controlled the movement of the train throughout the block upon which the train was then entering. The other, called the "continuous" system, kept up a fire of track information at every foot of the way over which the train passed. Incidentally it may be remarked that, expressed in terms of total mileage, the majority of systems in use are of the intermittent type. The explanation of this preference may and probably does lie in the fact that the continuous system costs more.

We are now prepared to understand why the railroad managements objected to certain features at first proposed in these train controlled systems, to some of which we have adverted. Take, for illustration, the feature of whether the system or the engineer should be the master of the movements of the train. If there is a "pick up" at the entrance to a block which calls for a "caution" signal, the train ahead may an instant after have passed into the next block so that the block, in which the following train then is may be "clear," and the engineer may know this. There is no longer need that the train proceed at "caution" speed throughout that block, which may be a long one, so that much time is lost which might be saved if the engineer could assume control.

It may be interpolated here that, if the engineer is given the power to put the automatic system for the time being out of commission, a special mechanism for "suppressing" it was necessary, and as a check upon the engineer it was thought desirable to require him to make an "acknowledgment" which registered the fact that he had taken control.

We can now get a pretty clear view of the conditions of the problem which confronted the deviser of one of these systems. They are fairly well summarized in the offer before mentioned of a money prize made by one of the railroad companies. The job was one of construction. There was little more room for invention than is afforded to a contractor who erects a building in accordance with general plans and specifications, but is left to follow his own working plans. Any two or more constructions which followed the same plans and specifications were bound to be very much alike. Every element which entered into the combination which made up the device as a whole was not only known, but must be utilized as it was. The only room for choice or selection was in the in-

corporation or rejection of certain features. The system might be under the control of the engineer or beyond it; it might be of the intermittent or continuous type; it might be a three position or three speed system less or more or it might have or omit other special features. If any two systems were compared they would be alike except in respect to the presence or absence of some of these or other features. As long as the installation was expected of the railroads, the system must be constructed in accordance with their views. As soon as the installation by enforcement of the order of some Commission was looked for, then the system must conform to the views of the Commission. Congress finally forced action by authorizing the Commission to require of railroads the installation of an automatic train control system as automatic couplings have been required. The plaintiff has the exclusive right to the system described in these two patents claims 3, 23, 26, 27, and 32, of the first of which and claim 5 of the second are in issue. The Union Switch & Signal Company has installed a system of its devising. The contest here is between the two. There is a denial of invention in the denial of patentable novelty.

We have already in effect anticipated a judgment upon this feature of the case. Nothing more is required than a formal finding. As already indicated, the condition of the problem which confronted an inventor offered two possible solutions. He might of course (1) revolutionize the whole art, as Napoleon revolutionized the art of war. This is not claimed. All that was left to him was (2) to co-ordinate elements already in use as separate independent minor systems into one general system of automatic train control. This Schweyer did, and it is all which is claimed for him. Each one of these elements was not only old, but he was obliged to incorporate it (as, for illustration, the braking system) as it was. All he could do was to weave it into the general control system, which he was devising, so as to make it a part of his general integral system. There was no call for invention in doing this of itself. He did have a choice or selection in what he would incorporate and what reject. He could, for instance, put his automaton in control of the engine man or give the engine man control. He could, again for instance, adopt the "intermittent" or the "continuous" type and so likewise of other features. He might add or reject features, as, for illustration, the dictation of maximum speed. If he incorporated in his system the

engineer's control of the otherwise automatic functioning, he might add a "suppressing" mechanism and a "registering" device. If he used the "induction" coil, he must introduce an "amplifier." There was thus room for the combining of selected elements into one system of train control so as to have a patentable combination, making of the system so devised the inventor's own system. Such a system, being his, could not be made, used, or vended by another. The patentability of such a system would reside wholly in that particular combination, and the claims of any patent granted must be correspondingly limited in scope. No such patentee could complain of another devised system because it had many features in common with those of his system. Likeness, or indeed identity, to this extent was forced. All these features came from the possessions of the prior art. The grant of the patents in suit carries to this extent the finding of validity, and with this limitation validity is found.

This brings us to the real issue in the cause, which is one of infringement. We find the system of the patents and that of the Union Switch & Signal Company, which is the system charged to be an infringement, to be different systems, viewed in the light of the prior art, and that in consequence neither is an encroachment upon the other. We see nothing but an unnecessary prolongation of this opinion to result from a differentiating description of the two systems. The fact features are clearly disclosed in this record. The discussion, on the one hand upholding and supporting the conclusion of identity, in the equivalency sense, of the two systems, and, on the other, the opposing conclusion that the two systems are wholly different in "purpose, functioning, mode of operation and structure," is in the very ablest of hands pro and con.

■ The whole discussion may be summed up in these propositions:

Given a number of separate and independently functioning devices and systems, some and as many as possible of which are to be combined and incorporated in one system of automatic train control; given likewise one combination of some of these elements and a second different combination, each answering to the same final purpose and the first patentable as a specific combination or system—the second is not an infringement of the first because some of the elements in combination are common to both, these common elements being the contribution of the prior art. When all the elements have been contributed by the prior art, the test of infringement between two systems is whether they present the same combination, not whether many of the elements are the same in each nor whether as systems they have the same final purpose and accomplish the same result. Of course the inclusion of one element or the exclusion of another for the sole purpose of making them different would not halt a finding of infringement.

Nothing we could say would add anything of value to this discussion, so we content ourselves with the simple statement of the finding of fact which we have reached, which is that the Schweyer and the Union systems are different systems, although they have features in common which the prior art has contributed to each. This calls for the finding of noninfringement.

■ We have filed herewith and incorporate in this opinion the requests for findings of fact and conclusions of law submitted, together with our answers thereto.

To give definiteness of date for appellate or other purposes, no decree is now made, but the parties have leave to submit a formal decree, dismissing the bill for want of equity, with costs to defendant, etc.

### Requests for Findings of Fact and Conclusions of Law.

#### Plaintiff's Requests.
#### Findings of Fact.

1. The plaintiff, Schweyer Electric and Manufacturing Company, a corporation of Pennsylvania, is the owner of the entire right, title, and interest in and to United States letters patent, Nos. 1,279,454 and 1,389,602, in suit, and all rights of action for past infringement thereof.

Answer: Found as requested.

2. The defendant Union Switch & Signal Company and its owned and controlled subsidiary, Union Signal Construction Company, within six years prior to the filing of the bill of complaint herein, manufactured and installed upon the lines and locomotives of the defendant Atlantic City Railroad Company certain apparatus for automatic train control, the construction and operation of which is illustrated and described in Plaintiff's Exhibits A, H, N, and O, and which is known as the Union Continuous Three-Speed System of Automatic Train Control.

Answer: Found as requested.

3. The defendant Reading Company, through its subsidiary, defendant Atlantic City Railroad Company, which is owned and

controlled by Reading Company, has used and is using the Union Three-Speed System of Automatic Train Control, as illustrated and described in Plaintiff's Exhibits A, H, N, and O.

Answer: Found as requested.

4. The combination of elements defined by claims 3, 23, 26, 27, and 32 of the Schweyer patent, No. 1,279,454, was not disclosed in any of the prior patents and publications offered in evidence and is novel.

Answer: Found as a specific combination.

5. The defendants have not established the prior invention or knowledge by others of the combination of elements defined by claims 3, 23, 26, 27, and 32 of Schweyer patent, No. 1,279,454.

Answer: Found as a specific combination.

6. The combination of elements defined by claims 3, 23, 26, 27, and 32 of Schweyer patent, No. 1,279,454, involved invention, and was patentable over the prior art.

Answer: Found as a specific combination.

7. The apparatus disclosed in the Schweyer patent, No. 1,279,454, is operative to accomplish the results therein set forth.

Answer: Found as operative in the patentable sense.

8. The Union Three-Speed System, illustrated and described in Plaintiff's Exhibits A, H, N, and O, embodies a combination of elements which is the equivalent of the combination of elements covered by claims 3, 23, 26, and 27, and 32 of Schweyer patent No. 1,279,454, within the reasonable range of equivalents to which such patent is entitled because of its position in the art.

Answer: Refused.

9. The Union Three-Speed System, illustrated and described in Plaintiff's Exhibits A, H, N, and O, embodies the combination of elements covered by claims 3, 23, 26, 27, and 32 of Schweyer patent, No. 1,279,454, and is an infringement thereof.

Answer: Refused.

10. Claim 5 of Schweyer patent, No. 1,389,602, sets forth a patentable combination of elements, not an aggregation.

Answer: Found as a specific combination.

11. The combination of elements defined by claim 5 or Schweyer patent, No. 1,389,602, was not disclosed in any of the prior patents or publications offered in evidence, and is novel.

Answer: Found as to the specific combination.

12. The defendants have not established the prior invention or knowledge by others of the combination of elements defined by claim 5 of Schweyer patent, No. 1,389,602.

Answer: Found as to this specific combination.

13. The combination of elements defined by claim 5 of Schweyer patent, No. 1,389,602, involved invention, and was patentable over the prior art.

Answer: Found as a specific combination.

14. The apparatus disclosed in Schweyer patent, No. 1,389,602, is operative to accomplish the results therein set forth.

Answer: Found in the patentable sense of "operative."

15. The Union Three-Speed System, illustrated and described in Plaintiff's Exhibits, A, H, N, and O, embodies a combination of elements which is the equivalent of the combination of elements covered by claim 5 of Schweyer patent, 1,389,602, within the reasonable range of equivalents to which such patent is entitled because of its position in the art.

Answer: Refused.

16. The Union Three-Speed System, illustrated and described in Plaintiff's Exhibits, A, H, N, and O, embodies the combination of elements covered by Schweyer patent, No. 1,389,602, and is an infringement thereof.

Answer: Refused.

### Conclusions of Law.

1. Schweyer patent, No. 1,279,454, is not prior art as against Schweyer patent, No. 1,389,602, since the applications for said patents were copending.

Answer: Found.

2. Schweyer patent, No. 1,279,454, as to claims 3, 23, 26, 27, and 32 thereof, is valid, and has been infringed by defendants.

Answer: Refused as written.

3. Schweyer patent, No. 1,389,602, as to claim 5 thereof, is valid, and has been infringed by defendants.

Answer: Refused as written.

### Defendants' Requests.

### Findings of Fact.

1. The defendants' system at issue does not infringe claims 3, 23, 26, 27, and 32 of the first patent in suit, or any one of them.

Answer: Found as a fact.

2. Defendants' system does not infringe claim 5 of the second patent in suit.

Answer: Found as a fact.

3. Defendants' system includes no combination which is like or equivalent to any novel combination disclosed in either of the patents in suit.

Answer: Found as a fact.

4. Neither patent in suit discloses any new and useful combination.

Answer: Refused as written as a conclusion of law.

5. The first patent in suit as to claims 3, 23, 26, 27, and 32 thereof is invalid as covering nothing patentably novel.

Answer: Refused as written as a conclusion of law.

6. The second patent in suit as to claim 5 thereof is invalid as covering nothing patentably novel.

Answer: Refused as written as a conclusion of law.